IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

GLADYS ANDERSON, ET AL.

PLAINTIFFS

VS. CASE NO. 4:23-CV-685-LPR-ERE

NEWRAYS ONE, LLC

DEFENDANT

VIDEOGRAPHIC DEPOSITION

OF

CHAD WOOLEY
(Taken April 4, 2025)

ANSWERS AND DEPOSITION OF CHAD WOOLEY, a witness produced at the request of the DEFENDANTS, was taken in the above-styled and numbered cause on April 4, 2025, before Gwendolyn R. LaSalle, Certified Court Reporter, LS Certificate No. 510, a Notary Public in and for Pulaski County, Arkansas, at the offices of Kutak Rock, located at 124 West Capitol Avenue, Suite 2000, Little Rock, Arkansas, at 9:13 a.m.

EXHIBIT
3

A P P E A R A N C E S

BARRETT S. MOORE
Blair & Stroud
P.O. Box 2135
Batesville, Arkansas 72503
(870) 793-8350
bsm@blastlaw.com

APPEARING FOR PLAINTIFFS

ALEXANDER T. JONES
Kutak Rock LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
(501) 975-3000
alex.jones@kutakrock.com

APPEARING FOR DEFENDANT

PHILIP MURPHY
Faulkner County Civil Attorney
801 Locust Street
Conway, Arkansas 72034
(501) 450-4900
phil.murphy@faulknercountyar.gov

APPEARING FOR FAULKNER COUNTY

ALSO PRESENT

JOHN PEARSON, VIDEOGRAPHER

MICKEY MCMILLEN

GLADYS ANDERSON (via Zoom)

NANCY DICKERSON (via Zoom)

SHANE MARKUSON (via Zoom)

# I N D E X


| TOPIC | PAGE |
|---|---|
| APPEARANCES | 2 |
| WITNESS SWORN: CHAD WOOLEY | 5 |
| Examination by Alexander T. Jones | 6 |
| Examination by Barrett S. Moore | 78 |
| Further Examination by Alexander T. Jones | 102 |
| REPORTER'S CERTIFICATE | 106 |


# E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Notice of deposition and subpoena | 7 |
| EXHIBIT 2 | Ordinance 23-20 | 12 |
| EXHIBIT 3 | Documents produced in response to subpoena | 24 |
| EXHIBIT 4 | 2023 emails | 25 |
| EXHIBIT 5 | 2024 emails | 25 |
| EXHIBIT 6 | 7/28/23 email | 26 |
| EXHIBIT 7 | Faulkner County Prosecuting Attorney case file | 34 |
| EXHIBIT 8 | Aerial photograph with Bono Entergy Power Station labeled | 45 |
| EXHIBIT 9 | Aerial photograph with Highway 285 labeled | 45 |
| EXHIBIT 10 | Google street view photograph | 45 |
| EXHIBIT 11 | 4/23/24 email string | 62 |
| EXHIBIT 12 | 10/28/24 email string | 64 |


(continued)

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 13 | Materials produced by witness at deposition | 80 |
| EXHIBIT 14 | FOIA Document 4106 - list of complaints | 95 |
| EXHIBIT 15 | FOIA Document 220 - photograph of sound meter reading | 97 |

Q. Did you perform any calibration on the device? It looks here to have been done last, same as the other entries, 9/8/2023 at 1100 hours, per operation -- per instruction manual.
A. Yes. The ordinance says calibration every two years. I do not believe the manual for the calibrating tool had a recommended calibration schedule. So it was -- it was not calibrated prior to that reading.
Q. And that's all I'm asking, not --
A. Yes, sir.
Q. -- whether you showed up or not, but whether you did. It's just a fact question.
A. Yes, sir.
Q. You did not.
A. I did not.
Q. And you had not since September 8th of 2023.
A. That's correct.
Q. Now, this doesn't itself have a narrative, but it led to a narrative in the incident report and ultimately an affidavit; correct?
A. That's correct. Yes, sir.
Q. Obviously, I need to ask, what is your explanation for the lack of body cam footage on the violation measurement?
A. Yes, sir.
So we have docking stations. Each patrol deputy is

issued a body cam. Being administrative, I'm not out on the street normally every day. So if I know ahead of time that I'm going out to do some kind of activity, I will go in the records room, and I will pull a body cam off the docking station, sign it out to myself. As I did the other times, I can -- it would be speculation at this point, because I don't recall, that there wouldn't have been a camera available on that docking station at that time, because I don't keep one assigned to me at all times.
Q. What do you mean by "sign it out"?
A. So we have -- there's a docking -- it's the computer program, Motorola.
You go in there, and you pull up records room docking stations. It gives you a list of body cameras that are available for use. You drop down, hit your name. It beeps. You go pick it up, and it's assigned to you.
When you get done, you put it back on the dock. It uploads the footage. Anybody else can check out that same -- same camera. They just have to -- it gets reassigned.
Q. Okay. And if you can clarify for me, it's your testimony that there was no one -- none was available to you?
A. That would be -- I can't answer that 100 percent that without -- I don't recall, but that would be my only reason I probably wouldn't have had one, is there was not one available, because I did get them on these other dates.

Q. You said it's a Motorola system.
A. Uh-huh.
Q. That's a "yes"?
A. Yes, sir.
Q. Does it log who has body cam footage for body cameras --
A. Yes.
Q. -- at any given time?
A. It should.
Q. Is that data that is stored by the Faulkner County Sheriff's Office?
A. I would have to check. I'd have to check. I mean, it -- it's -- it logs all -- all kinds of footage.
Q. Well --
A. But I don't recall.
Q. But you're saying there's a check-in -- I'm trying to be precise.
A. Uh-huh.
Q. You're saying there's a check-in process, checkout process --
A. Uh-huh.
Q. For the actual physical --
A. Camera.
Q. -- device.
A. Yes, sir.
Q. Like an inventory system.

A. Yes, sir.
Q. Is that inventory system something that the Faulkner County Sheriff's Department maintains?
A. Should be. Should be in the program.
Q. Do you have access to that in your capacity as chief deputy sheriff?
A. My IT guy does. I'm sure I do. My -- my IT guy definitely would.
Q. You could instruct an IT guy to search for recordkeeping related to this day, May 19, 2024?
A. I could, yes, sir.
Q. Are you willing to do that?
A. Sure. Absolutely.
Q. I'd like to request that you do that. I had not specified this in the subpoena, but I'm happy to work with you and Mr. Murphy about that --
A. Uh-huh.
Q. -- in a reasonable time. Obviously, we're coming up on a weekend. Maybe we can touch base next week.
MR. MURPHY: That will be fine.
MR. JONES: Thank you.
BY MR. JONES:
Q. So you're not entirely sure why --
MR. JONES: Oh, sorry?
MR. MURPHY: We'll talk about it afterwards.

MR. JONES: Thank you.

BY MR. JONES:

Q. You're not entirely sure why you didn't have one.

A. That's correct.

Q. Did you expect to go out there that day to take the -- the measurements?

A. I did, because I knew there was a complaint.

Q. Could you have waited until you had access to a body cam?

A. I could have, yes, sir.

Q. You didn't.

A. No, sir.

Q. And multiple times today your testimony was that you would prefer to refer back to the body cam because it would clarify questions I asked you about your measurements, haven't you?

A. True. Yes, sir.

Q. It would be an important thing to have, body cam footage of your measurements.

A. Correct.

Q. Particularly because the other data that you took down in handwriting you cannot find.

A. Uh-huh.

Q. Correct?

A. Yes, sir.

Q. And so there is nothing corroborating the report besides

your testimony as to what measurements you took on the day of the violation.
A. That's correct.
Q. There are corroborations, conversely, of the other times you went out there from the body cam footage; correct?
A. That's correct.
Q. Looking at the measurements themselves, these are identical, essentially, to the measurements of September 10, 2024, meaning the decibel level is the same.
A. Yes, sir.
Q. 3.4 decibels over; correct?
A. Yes, sir.
Q. What was possibly arguable back in September 2023.
A. Uh-huh.
Q. That's a "yes"?
A. Yes, sir.
Q. A slight overage.
A. Yes, sir.
Q. There isn't a -- what did you do based on your measurements on -- or on May 19, 2024?
A. I referred it to the prosecuting attorney's office for a -- for a violation.
Q. That's not what you did on September 10, 2023.
A. No, sir. No, sir.
Q. What changed?

Q. Instructed to do it.
A. No, sir.
Q. Have you ever received any instruction from any public official to serve criminal summons on Chunhua Zhao or Changhong Changhong Wu?
A. I -- I don't recall.
Q. Why don't you recall that?
A. I don't recall where those names come from without looking to see if there's correspondence on -- I remember some -- there -- there may be an email that had some names listed on it, but I can't recall without looking or knowing where it's at.
Q. Neither of those names is in your affidavit; correct?
A. Correct.
Q. Looking at paragraph -- or go back to Exhibit 6, please. Again, I'm sorry about the lack of pagination.
A. Six or seven, sir?
Q. It's a 2024 email correspondence produced in response to the subpoena. So it may be five.
MR. MOORE: I think it's five.
MR. JONES: My bad.
BY MR. JONES:
Q. I'm looking at the -- kind of counting backwards here toward the bottom. It's, like, 12 or 13 pages from the back. It's a criminal summons.

A. Yes, sir.
Q. This has the name Chunhua Zhao, Defendant.
A. Yes, sir. Yes, sir.
Q. Does this refresh your recollection?
A. The -- the emails following that, yes, sir.
Q. Please, if you can, if your recollection is refreshed, have you ever received an instruction to serve a summons on either Chunhua Zhao or Changhong Changhong Wu by a public official?
A. That's correct. Yes, sir.
Q. Yes, you have.
A. Yes.
Q. Who instructed you to do that?
A. The prosecuting attorney's office.
Q. Jacob Webb.
A. Yes, sir.
Q. Nick Sissel, M'Lynn Johnson.
A. Yes, sir.
Q. Was this at the instruction of any other prosecuting attorney?
A. I'm not aware if it is. Unless it's documented in here, I'm not aware.
Q. So look. And I understand what you're saying. Let me ask for the whole universe of things.
There wasn't some other request for you to do so.

A. (Shook head.)
Q. There was not?
A. Not by another -- no, sir.
Q. Not by Carol Crews?
A. Not that I recall, again, unless it's documented here that she -- I don't believe. I can't recall if there is.
Q. Well, if you'll compare it to Exhibit 13, weeks later -- you can go back to Exhibit 13. You write, "Our prosecutor's office is inquiring of the efforts made for this summons."
A. Yes, sir.
Q. That was three or four weeks after Mr. Webb's email here that has been produced and is contained within Exhibit 5. You're saying you don't recall any other instruction by the prosecuting attorney's office to serve that subpoena, but three weeks after that, you reach out for the first time to Ms. Tilley, saying, "Our prosecutor's office is inquiring of the efforts made for this summons."
Does that refresh your recollection?
A. And I may have misunderstood your question.
I don't recall a person, but that email there was based on the request of the prosecutor's office. I just -- I can't remember if it was Jacob or it was Nick, it was M'Lynn, it was Ms. Crews or Mr. Howell. I -- I don't remember.
Q. How was that request made?
MR. MOORE: For the record, I think you said

Exhibit 13. I think you meant Exhibit 12.

MR. JONES: Oh.

MR. MOORE: It's an email.

MR. JONES: Thank you. I'm sorry.

MR. MOORE: No problem.

THE WITNESS: It's not by email, so I -- I don't -- I don't recall. I mean, I -- I -- I don't want to guess. It could be a phonecall, but it's -- it's not by email that I'm aware of.

BY MR. JONES:

Q. You've produced, as I mentioned, email correspondence from 2023 and 2024 in response to the first subpoena in this case, the subpoena duces tecum.

A. Uh-huh.

Q. You've not produced any text message correspondence. You've not produced any other written correspondence. You understand that? That you have not produced it. You understand that you have not; correct?

A. Yes, sir. Yes, sir.

Q. Have you ever sent or received a text message that was work related?

A. In any fashion?

Q. Yes.

A. Yes, sir.

Q. Have you ever sent or received a text message about

Ordinance 23-20?
A. I'm not aware. I -- I don't recall that.
Q. Could you check?
A. Could I check?
Q. Yes, sir.
A. Sure.
Q. I'm not asking you to do it right now, but you could check.
A. Well, I mean, I just got a new phone a couple months ago. I mean, I guess I could check what I've got now.
Q. Have you ever sent or received a text message about NewRays One, LLC?
A. Not that I recall.
Q. Have you ever sent or received a text message to or from Carol Crews?
A. Yes.
Q. Have you ever sent such a -- sent or received such a message about NewRays One, LLC?
A. Not that I recall.
Q. Jacob Webb, same question.
A. Yes, but not that I recall referencing this.
Q. Randy Higgins, same question.
A. Yes, but not that I recall referencing NewRays.
Q. Allen Dodson, same question.
A. Yes, but not that I recall about NewRays.

Q. Chris Carnahan, same question.
A. I don't recall either way on that one. I don't recall receiving a -- texting Judge Carnahan or texting Judge Carnahan in reference to NewRays.
Q. Phil Murphy?
A. Yes, we have texts. I am not aware -- yes, the -- possibly the notice of today's hearing.
Q. Understood.
About NewRays about the Ordinance 20-23? Let me -- or 23-20. Pardon me.
A. Not that I recall.
Q. Gladys Anderson, same question.
A. I don't believe I've ever spoke to Ms. Anderson other than the day I was coming out there.
Q. So back to Exhibit 12, the inquiry was not made via email is your testimony?
A. If I do not have an email produced, that is correct.
Q. Could it have been by text message?
A. I don't recall. I don't know.
Q. I'm -- you -- I understand that you don't recall whether it was.
A. Uh-huh.
Q. My question is, is it possible it could have been.
A. Yes, it could be possible. Yes, sir.
Q. You've texted with prosecutors about cases before.

A. Yes, sir.
Q. I'm not saying there's anything wrong with that.
A. Uh-huh.
Q. What I'm saying is, I may need to have the evidence, because, first, we've asked for it.
A. Uh-huh.
Q. And second, it may shed light on who was instructing you to pursue summonses as to individual defendants in a criminal case.
A. Yes, sir.
Q. Do you understand why that's an important thing for me to look at?
A. Yes, sir.
Q. And you're willing to look into that.
A. Uh-huh.
Q. That's a "yes"?
A. Yes, sir.
MR. JONES: I can envision questions remaining about two issues which I want to talk with the lawyers about, which is why I would keep it open, the body cam footage check-in/checkout, any sort of service instructions related to these individual defendants.
And with that, I pass the witness.
* * * * *

business. So . . .

Q. Do you have reserve deputies in Faulkner County?

A. I do.

Q. Do you have a body camera for every reserve deputy in Faulkner County?

A. They're -- yes, sir.

Q. You do.

A. Yes, sir.

Q. Okay. So you believe that it's possible that there were no body cameras on the day in question.

A. That is possible, yes, sir. Out -- outside of that, I don't -- I don't have an answer.

Q. Is there a policy in Faulkner County about always wearing a body camera if you're out on -- doing any kind of investigation?

A. There is.

Q. Okay. The recordings you measured in May of 2024 as reported, did you -- are those, in fact, the recordings that you measured?

A. Yes, sir.

Q. The ones you reported?

A. Yes, sir.

Q. You're not making that up, are you?

A. No, sir.

Q. Okay. If the -- the records that have been produced by

device, it was the manual, not some -- not other -- not other sources of information.
A. Yes, sir.
Q. You were asked if you had the full opportunity to answer your questions today. Let me clarify a few points on that specific topic.
You have not checked to see if the prosecuting attorney's office texted you to follow up on the summonses; correct?
A. Correct.
Q. You have not checked into the actual check-in/checkout of the camera system; correct?
A. Correct.
Q. So in some ways, there are other things out there that you would need to know to fully answer all of the questions you've been asked.
A. Correct.
MR. JONES: With that, I pass the witness.
MR. MURPHY: I have no questions.
MR. MOORE: Okay. I'd say he's free to go.
MR. JONES: I agree.
Thank you.
THE WITNESS: Yes, sir.
THE VIDEOGRAPHER: We're off the record at 11:36.
(The jump drives from Exhibit 13 were retained